IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CELESTER EDWARDS, ) | |
| ) | |
|    Plaintiff, ) | |
| ) | |
| v. ) | Case No.   17-cv-1344-RJD |
| ) | |
| DR. MICHAEL SCOTT and WEXFORD ) | |
| HEALTH SOURCES, INC., ) | |
| ) | |
|    Defendants. ) | |

## ORDER

**DALY, Magistrate Judge:**

Plaintiff Celester Edwards, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while he was incarcerated at Pinckneyville Correctional Center ("Pinckneyville"). Plaintiff complains he was provided inadequate treatment for his sleep apnea and hammertoe in 2017. Plaintiff is currently proceeding in this action on the following claims:

> Count One:   Defendants Scott and Wexford Health Sources, Inc. ("Wexford") showed deliberate indifference to Plaintiff's sleep apnea and issues associated therewith, including chest pain and shortness of breath, in violation of the Eighth Amendment.
>
> Count Two:   Defendants Scott and Wexford showed deliberate indifference to Plaintiff's hammertoe and issues associated therewith in violation of the Eighth Amendment.

This matter is now before the Court on Defendants' Motion for Summary Judgment on the Merits (Doc. 74). For the reasons set forth below, the Motion is **GRANTED**.

## Medical Records

Both Plaintiff and Defendants submitted Plaintiff's medical records in support of their

summary judgment briefing. Normally, to demonstrate trustworthiness and reliability of such documents at the summary judgment stage, the party seeking to offer the business record must attach an affidavit sworn to by a person who would be qualified to introduce the record as evidence at trial, for example, a custodian or anyone qualified to speak from personal knowledge that the documents were admissible business records. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Neither Plaintiff nor Defendants provided such an affidavit. Defendants only provided the declaration of Dr. Scott, which is only sufficient to address the accuracy of medical records he created as he only states that his care and treatment "is accurately reflected in [his] notes in Mr. Edward's chart, that [he] penned with [his] own hand, contemporaneously with the treatment that was being provided" (Doc. 75-3 at ¶ 6). However, in this instance, there has been no objection to the consideration or use of the medical records at this stage in the proceedings. Because there have been no objections to the use of Plaintiff's medical records and both parties have submitted records in support of their positions, the Court will consider the medical records without the required authenticating testimony. *See Medina v. City of Chicago*, No. 01-C-9490, 2002 WL 31027965, *2 (N.D. Ill. Sept. 10, 2002) (wherein the court considered documents offered by both sides without the required authenticating testimony because the authenticity of the documents were not disputed, the documents were business records produced during discovery, and some documents had been offered by both the plaintiff and defendant).

## Factual Background

### *Sleep Apnea*

Plaintiff first started experiencing sleep apnea symptoms when he was incarcerated at the Cook County Jail in 2014 (Deposition of Celester Edwards, Doc. 75-1 at 2). Plaintiff was transferred to Pinckneyville on March 21, 2016 (Doc. 77 at 4, ¶ 1; *see* Doc. 75-2 at 1). Plaintiff

attests that upon his transfer to Pinckneyville he informed a nurse about his pre-existing conditions, including asthma, bronchitis, sleep apnea, breathing problems, and hammertoe (Doc. 77 at 4, ¶ 2). Plaintiff asked the nurse if he could speak to a doctor, but she refused (*Id.* at ¶ 3). Plaintiff attests that he submitted a medical request slip on March 22, 2016 to bring his medical conditions, including sleep apnea and hammertoe, to a doctor's attention (*Id.* at ¶ 4).

According to Plaintiff's medical records, Plaintiff was seen by nurses during nurse sick call on March 30 and March 31, 2016, wherein Plaintiff's complaints of asthma and sleep apnea were documented (*see* Doc. 75-2 at 2 and Doc. 77 at 21). On April 4, 2016, Plaintiff was seen by a nurse practitioner and requested a sleep study for his sleep apnea (Doc. 75-2 at 3; Doc. 77 at 23). On April 18, 2016, Plaintiff was first seen by Defendant Dr. Scott (Doc. 75-2 at 4; Doc. 77 at 24). Plaintiff discussed his sleep apnea with Dr. Scott and requested a sleep study (*Id.*). Plaintiff asserts he attempted to discuss both his sleep apnea and hammertoe with Dr. Scott, but Dr. Scott told Plaintiff he could only address one problem (Doc. 77 at 4, ¶ 5). Dr. Scott submitted a request to collegial for Plaintiff to undergo a sleep study (Declaration of Dr. Michael Scott, Doc. 75-3 at ¶ 7; Doc. 75-2 at 4; Doc. 77 at 24; Doc. 77 at 48). On April 25, 2016, Dr. Scott discussed the request for a sleep study during collegial review with Dr. Ritz, and it was determined that Dr. Scott would obtain Plaintiff's Epworth Sleepiness Score on or before May 23, 2016, and report back to collegial (Doc. 75-2 at 35, 37). Plaintiff's Sleepiness Score was obtained on May 2, 2016, and Dr. Scott received approval from collegial for an on-site sleep study (*Id.* at 6, 36). Plaintiff's sleep study was performed on June 5, 2016 (*Id.* at 7-8; Doc. 77 at 69-70). A report was completed by Dr. Thomas Lehman off-site and indicated that Plaintiff had mild, non-positional obstructive sleep apnea (Doc. 75-3 at ¶ 8; Doc. 75-2 at 38-39). Treatment considerations included the use of a nasal continuous positive airway pressure ("CPAP") machine, mandibular advancement splint (MAS),

or "referral to an ENT surgeon for modification to the airway … if the patient prefers an alternative therapy or the CPAP trial is unsuccessful" (Doc. 75-2 at 38; Doc. 77 at 69-70).

Dr. Scott met with Plaintiff on June 15, 2016 to discuss the sleep study report (Doc. 75-3 at ¶ 10; Doc. 75-2 at 9; Doc. 77 at 30). Plaintiff testified that he told Dr. Scott he wanted the CPAP machine, but did not want surgery (Doc. 75-1 at 9). Plaintiff also testified that he was never presented with a mouthpiece as an option (*Id.*). Following this meeting with Plaintiff, Dr. Scott submitted a request to collegial for Plaintiff to get a nasal CPAP machine (Doc. 75-3 at ¶ 10; Doc. 75-2 at 40). Following a discussion in collegial by Dr. Fisher and Dr. Scott, an approval was made for Plaintiff to obtain a Pro Adjustable Night Guard Bruxism Mouthpiece Aid, a type of MAS (Doc. 75-3 at ¶ 11; Doc. 75-2 at 41). Dr. Scott attests that an MAS was a reasonable first step for Plaintiff's mild sleep apnea and, given the mild nature of his condition, it would also have been appropriate to simply recommend lifestyle changes and continue to monitor Plaintiff (Doc. 75-3 at ¶ 12).

Plaintiff was called to see the dentist concerning his mouthpiece, but Plaintiff refused because he had not been told about the mouthpiece by Dr. Scott and the dentist was unable to explain the purpose of the same (Doc. 77 at 5, ¶ 11). Plaintiff met with Dr. Scott on July 5, 2016 to discuss the need for dental impressions and measurements for the MAS (Doc. 75-2 at 11). Plaintiff subsequently received the MAS (Doc. 77 at 6, ¶ 13).

Plaintiff attests he was seen by a nurse practitioner on January 8, 2017 wherein he explained he was still having serious issues with his sleep apnea and was having trouble breathing (Doc. 77 at 6, ¶ 15). Plaintiff also told the nurse practitioner that the mouthpiece he had been issued was cutting the inside of his lower lip and was causing injury to his mouth (*Id.*). Plaintiff asserts the nurse told him he should be on a CPAP machine and she referred Plaintiff to Dr. Scott

for evaluation (*Id.* at ¶ 17).  According to Plaintiff's medical records, Plaintiff was seen on January 5, 2017 in nurse sick call with complaints that his mouthpiece was not working and he requested a CPAP machine instead (Doc. 75-2 at 12; Doc. 77 at 33).  The next day, however, when again seen on sick call, Plaintiff indicated he was "good with all the sleep apnea stuff" and just requested a new inhaler (Doc. 75-2 at 13; Doc. 77 at 34).  Plaintiff was next seen by Dr. Scott on January 23, 2017 to again discuss his sleep study results (Doc. 75-2 at 16; Doc. 77 at 37).  According to Plaintiff, he told Dr. Scott he was suffering restless days and nights more so than usual and he was experiencing chest pain and difficulty breathing during the night (Doc. 77 at 7, ¶ 19).  Plaintiff asserts Dr. Scott told Plaintiff "they [were] not going to do shit" for him and did not provide him pain medication (*Id.*).  Plaintiff told Dr. Scott the MAS was hurting his mouth and Dr. Scott told Plaintiff he would put him in to see the dentist (Doc. 75-2 at 16; Doc. 77 at 37).  According to Dr. Scott's notes from this examination, he issued Nasacort for Plaintiff and discussed weight loss (Doc. 75-2 at 16; Doc. 77 at 37).

Dr. Scott resigned from his position on February 23, 2017, and his responsibility for Plaintiff's care ended on that date (Doc. 75-3 at ¶ 16).  Plaintiff contends his mouthpiece was never fixed and a nurse told him that Dr. Scott never referred him to see the dentist (Doc. 77 at 8, ¶¶ 26, 28).  Plaintiff asserts Dr. Scott never disclosed to Wexford that his mouthpiece had broken (Doc. 77 at 8, ¶ 30).  Plaintiff's dental records, however, indicate he was seen by the dentist on February 22, 2017, and his mouthpiece was adjusted (Doc. 75-2 at 45).

Plaintiff wrote an emergency grievance on March 10, 2017 requesting that he be referred to a sleep study specialist for a CPAP machine and treatment for chest pain and asthma (Doc. 77 at 9, ¶ 32).  Plaintiff asserts he wrote a follow-up letter to the warden on March 30, 2017, but never received any response to his letter or grievance (*Id.* at ¶¶ 33-34).  Plaintiff was seen by a physician

Page **5** of **15**

on April 7, 2017 who submitted a request for a CPAP machine, which he received on April 28, 2017 (*Id.* at 10, ¶¶ 38-39).

*Hammertoe*

Plaintiff's medical records first document Plaintiff's complaints concerning his hammertoe on January 30, 2017 (Doc. 75-2 at 17; Doc. 77 at 126). Plaintiff was provided Tylenol and referred to a physician (*Id.*). Plaintiff saw Dr. Scott on February 9, 2017 to address his hammertoe (Doc. 77 at 11, ¶ 43; Doc. 75-2 at 18). Plaintiff advised Dr. Scott that he was supposed to have hammertoe surgery while he was incarcerated at Cook County Jail and that he was sent to Stronger Hospital for a consultation for the same (*Id.*). Dr. Scott documented Plaintiff's request for surgery and requested medical records from Cook County Jail and Stronger Hospital (Doc. 75-3 at ¶ 14; *see* Doc. 75-2 at 18). Plaintiff asserts he advised Dr. Scott that he was experiencing pain in his right foot related to his hammertoe that was affecting his daily activities, such as his job assignment and ability to walk and stand (Doc. 77 at 11, ¶ 44). Plaintiff asserts Dr. Scott was very negative and unprofessional during this encounter, stating "these people won't do shit for you down here" and telling Plaintiff "you all people are always whinnying [sic]" (*Id.* at ¶ 45). Plaintiff asserts Dr. Scott refused to examine his hammertoe (*Id.* at ¶ 46). Plaintiff did not see Dr. Scott again for his hammertoe complaints prior to Dr. Scott's resignation on February 23, 2017, and Dr. Scott does not believe Plaintiff's medical records arrived prior to his resignation (Doc. 75-3 at ¶ 14; *see* Doc. 75-2 and Doc. 77). These records indicate that Plaintiff's hammertoe surgery would be an elective procedure that he could pursue upon his release (Doc. 75-2 at 48-49).

Plaintiff refused nurse sick call to address complaints of foot pain on April 12, 2017 because he would not pay another co-pay (Doc. 75-2 at 31; Doc. 77 at 128). Plaintiff was seen on April 14, 2017 by a nurse and was referred to a physician and issued pain medication (Doc. 77 at

129). Plaintiff was seen on May 27, 2017 by a physician, who noted he would be referred to a podiatrist (*Id.* at 130). There is no indication in the record before the Court that Plaintiff was referred to a podiatrist.

Plaintiff asserts he was told it was recommended that he wait until his release in 2034 to undergo surgery for his hammertoe (Doc. 77 at 15, ¶ 68). Plaintiff also asserts he was seen by Dr. Lochhead in 2017 and she indicated she would order him special shoes, but he has not received the same (Doc. 77 at 15, ¶ 73). Plaintiff asserts he still suffers from pain caused by his hammertoe (*Id.* at 16 ¶ 80).

## Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

**Discussion**

Plaintiff is proceeding in this action on Eighth Amendment claims of deliberate indifference against Dr. Scott and Wexford for delaying and/or failing to adequately treat Plaintiff's sleep apnea and hammertoe.

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, Plaintiff must show first that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

With regard to the first showing, the following circumstances could constitute a serious medical need: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.,* 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

A prisoner must also show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'." *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless

in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even recklessness as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. A factfinder may also conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Id.* (internal quotations omitted).

### *Serious Medical Need*

Defendants assert Plaintiff failed to demonstrate his sleep apnea or hammertoe constitute serious medical needs.

First, with regards to Plaintiff's sleep apnea, Defendants assert the results of the sleep study Plaintiff underwent in June 2016 showed he only suffers from mild sleep apnea. Defendants reference an article attached to Plaintiff's complaint from the Mayo Clinic indicating that mild sleep apnea does not require intervention, which corroborates Dr. Scott's attestation that treatment of Plaintiff's sleep apnea could have been limited to lifestyle changes given the mild nature of his condition. While the Court is mindful of the fact that Plaintiff's sleep apnea was deemed to be mild, it is not satisfied that his condition did not constitute a serious medical need. Although lifestyle changes may have been appropriate, Plaintiff was given further medical treatment including the issuance and use of a CPAP machine. Moreover, Plaintiff's condition required physician intervention and follow-up. As such, at this stage in the proceedings, the Court cannot find as a matter of law that Plaintiff's sleep apnea did not constitute a serious medical need.

Next, the Court considers whether Plaintiff's hammertoe constitutes a serious medical need under the Eighth Amendment. Defendants' argument is not well-developed, and not

supported by evidence in the record. Indeed, Defendants fail to point to any evidentiary support for their position. The Court notes that Dr. Scott's declaration indicates that not all hammertoe deformities require surgical repair and some patients are able to get relief by wearing larger, looser shoes; however, this does not establish that Plaintiff's hammertoe condition was not a serious medical need. The Court must view the evidence in the light most favorable to Plaintiff and, under this standard, finds that a reasonable jury may determine that his condition constituted a serious medical need insofar as it caused him pain and required a doctor's attention.

*Dr. Michael Scott*

Defendant Dr. Scott asserts he was not deliberately indifferent to Plaintiff's sleep apnea as his treatment was timely and appropriate in light of the nature of Plaintiff's condition. The Court agrees.

The evidence reflects Plaintiff first complained of sleep apnea to Dr. Scott on April 18, 2016. Shortly thereafter, Dr. Scott submitted a request for a sleep study to collegial review. It was determined Plaintiff's "sleepiness score" would need to be obtained prior to the approval of a sleep study. After obtaining Plaintiff's sleep score on May 2, 2016, Plaintiff underwent a sleep study on June 5, 2016 and a report was prepared by an outside physician. The physician reported that Plaintiff had mild sleep apnea and treatment could include the use of a CPAP machine, mouthpiece (MAS), or referral to an ENT surgeon for modification of the airway. Dr. Scott discussed the report with Plaintiff on June 15, 2016. There is a dispute as to what options were presented, but it is undisputed that Dr. Scott submitted a request to collegial review for a CPAP machine, but it was decided Plaintiff would receive a mouthpiece aid, a type of MAS. Plaintiff saw Dr. Scott on July 5, 2016 to discuss the need for dental impressions and measurements for the MAS. Plaintiff did not see Dr. Scott again to address this condition until January 23, 2017.

Plaintiff contends Dr. Scott ignored his complaints of pain and refused to provide him pain medication when Plaintiff told Dr. Scott his mouthpiece was causing him pain.  However, Dr. Scott did refer Plaintiff to the dentist (though Plaintiff asserts he never saw the dentist, which is contradicted by Plaintiff's dental records).  Dr. Scott also issued Nasacort for Plaintiff and discussed weight loss for management of his sleep apnea.  Dr. Scott did not see Plaintiff again for concerns related to sleep apnea prior to Dr. Scott's resignation on February 23, 2017.

Based on a review of the record, it appears Plaintiff may not have agreed with Dr. Scott's treatment regimen or decisions, but it is well-established that "[a] prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment was "blatantly inappropriate."  *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Greeno*, 414 F.3d at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).  Making such a showing is not easy as "[a] medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'"  *Pyles*, 771 F.3d at 409 (quoting *Sain v Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (other quotation omitted)).  In other words, federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment.  *Pyles*, 771 F.3d at 409 (citations omitted).

There is no evidence that Dr. Scott's prescribed course of treatment was "blatantly inappropriate."  Rather, the evidence demonstrates that Dr. Scott examined Plaintiff, promptly referred him to specialists for additional treatment, including a sleep study and fitting for a mouthpiece when his request for a CPAP was not granted, and provided medication, including

Nasacort. The record fails to demonstrate that Dr. Scott delayed or failed to provide Plaintiff with needed treatment. Further, Plaintiff may have preferred that he be issued a CPAP as an initial course of treatment, but the record before the Court does not indicate that the issuance of mouthpiece was "blatantly inappropriate." Accordingly, the Court finds that Defendant Dr. Scott's treatment of Plaintiff was grounded in professional judgment and was reasonable. *See Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008). For the above-mentioned reasons, Defendant Dr. Scott is entitled to judgment as a matter of law as to Count One.

Dr. Scott also contends he is entitled to summary judgment on Count Two, asserting there is no evidence he acted with deliberate indifference to Plaintiff's hammertoe condition in the two weeks from when the condition was brought to his attention and when his tenure ended and Plaintiff was no longer his patient. The evidence, when viewed in Plaintiff's favor, indicates that Plaintiff attempted to bring his hammertoe condition to Dr. Scott's attention on April 18, 2016, but Dr. Scott informed him he could only address one condition and, on that date, he was addressing Plaintiff's sleep apnea. This interaction, and Dr. Scott's refusal to address Plaintiff's hammertoe issue, is not sufficient to establish deliberate indifference. There is no indication Dr. Scott ignored a substantial risk to Plaintiff's health or that Plaintiff was suffering any significant pain. Plaintiff also could have put in for nurse sick call to address this issue soon after, but there is no indication he took such action.

Plaintiff next saw Dr. Scott to address his hammertoe condition on February 9, 2017, and Dr. Scott requested medical records from Cook County Jail and Stroger Hospital, where Plaintiff indicated he had been evaluated previously. Dr. Scott was no longer working at Pinckneyville when the records arrived and, thus, he never had an occasion to follow-up with Plaintiff. The Court cannot find that Dr. Scott's actions taken on February 9, 2017 were a violation of the Eighth

Amendment.  Dr. Scott requested records, but did not issue any pain medication to Plaintiff.  It appears that Plaintiff was not provided pain medication until April 14, 2017.  In consideration of the totality of the circumstances, including the relatively short length in the delay in receiving the pain medication and the nature of Plaintiff's pain and condition, the Court does not find Dr. Scott acted with deliberate indifference on February 9, 2017.  Indeed, there is no indication Plaintiff was suffering from extreme pain or advised Dr. Scott of the same.  The Court also notes Plaintiff had suffered from this condition for many years prior without any notable medical intervention.  *See Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) ("A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.  The length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.") (internal quotations and citations omitted).

For these reasons, Defendant Dr. Scott is entitled to summary judgment on Counts One and Two.

***Wexford Health Sources, Inc.***

Wexford asserts it is entitled to summary judgment on Counts One and Two because Plaintiff fails to assert there was any Wexford policy or procedure that resulted in a constitutional deprivation.

Where a private corporation has contracted to provide essential government services, such as health care for prisoners, the private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself.  *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014); *see also Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).  Accordingly, in order

for Plaintiff to recover from Wexford, he must offer evidence that an injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy.  *Shields*, 746 F.3d at 796.  Plaintiff must also show that policymakers were aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect him.  *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009).  Finally, a policy or practice "must be the 'direct cause' or 'moving force' behind the constitutional violation."  *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (internal citations omitted).

In response to Defendants' motion, Plaintiff indicates that Wexford denied any relief from medical decisions being made by Dr. Scott and other medical personnel.  Plaintiff also asserts that Dr. Scott and Christine Brown did not follow Wexford's policy when they denied and delayed his medical care and treatment, and that Wexford failed to take steps to ensure Plaintiff received needed treatment.  Despite these broad statements, Plaintiff has failed to articulate or point to any particular policy or practice attributable to Wexford that caused him injury, and the Court can find none.  Plaintiff was seen on numerous occasions for his complaints of sleep apnea while at Pinckneyville and was ultimately issued a CPAP machine.  Further, although Plaintiff contends he has not received special shoes to address his hammertoe condition, the Court cannot find any policy or practice of Wexford attributable to such a delay.  For these reasons, Defendant Wexford Health Sources, Inc. is entitled to summary judgment as to Counts One and Two.

## Conclusion

Based on the foregoing, Defendants' Motion for Summary Judgment on the Merits (Doc. 74) is **GRANTED**.  The Clerk of Court is directed to enter judgment in favor of Defendants Dr. Michael Scott and Wexford Health Sources, Inc. and against Plaintiff Celester Edwards and close

this case.

**IT IS SO ORDERED.**

**DATED: December 3, 2020**

*s/  Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**
